**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 00-20917
_____


PAINEWEBBER INCORPORATED,

Petitioner-Appellee,

versus

THE CHASE MANHATTAN PRIVATE BANK (SWITZERLAND),

Respondent-Appellant.

_____

Appeal from the United States District Court
For the Southern District of Texas

_____
July 31, 2001

Before SMITH, DUHÉ, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Respondent-Appellant The Chase Manhattan Private Bank (Switzerland) ("Chase-Switzerland") appeals the district court's order to arbitrate third-party claims brought against it by PaineWebber Incorporated ("PaineWebber"), contending that the district court lacked personal jurisdiction over it. We agree, and vacate the district court's order.


I.
FACTS AND PROCEEDINGS

This dispute had its genesis in 1994 when PaineWebber, a financial services firm specializing in private wealth management, approached Chase-Switzerland, a Swiss bank, to secure its services for PaineWebber customers. After protracted negotiations, the parties entered into an agreement in June 1994 whereby PaineWebber would refer its customers who wished to house their assets in a Swiss bank to Chase-Switzerland (the "Referral Agreement"). Under the Referral Agreement, a PaineWebber customer would open a custodial account at Chase-Switzerland, which would in turn open an omnibus brokerage account at PaineWebber. PaineWebber would then execute transactions for the customer in the omnibus account. Most importantly for the instant case, the Referral Agreement provides:

> Any dispute between [Chase-Switzerland] and PaineWebber which cannot be resolved by good faith negotiations shall be submitted to the appropriate arbitrator or court in the United States.

Not long after negotiating the Referral Agreement, PaineWebber referred the Lerma family of Mexico to Chase-Switzerland. A company controlled by the Lermas[1] opened an account with Chase-Switzerland, and Enrique Ernesto Perusquia ("Perusquia"), then a PaineWebber vice president, was designated by the Lermas as the "Independent Asset Manager" of their account. Chase-Switzerland opened an omnibus account at PaineWebber pursuant to the Referral

---

[1]For simplicity, we will refer to the Lerma family and their company as "the Lermas."

Agreement and executed a PaineWebber trading authorization form.

The account-opening documents gave PaineWebber no authority to trade options in the omnibus account. Nevertheless, approximately nine months after Chase-Switzerland opened the omnibus account, at least one such transaction was executed in the account. PaineWebber belatedly sought Chase-Switzerland's retroactive approval by requesting its signature on a one-page form contract entitled "Client Option Agreement and Qualification Form" (the "Option Agreement"). In fine print on the form, the Option Agreement contained the following boilerplate arbitration clause:

> I agree and by carrying an account for me you agree, that any and all controversies which may arise between you and me concerning any account, transaction, dispute or the construction, performance, or breach of this or any other agreement whether entered into prior, on or subsequent to the date shall be determined by arbitration. Any arbitration under this agreement shall be held under and pursuant to and be governed by the New York Exchange, Inc., or the National Association of Securities Dealers, Inc. I may also select any other national securities exchange's arbitration forum upon which PaineWebber is legally required to arbitrate the controversy with me, including, where applicable, the Municipal Securities Rule Making Board. Such arbitration shall be governed by the rules of the organization convening the panel. I may elect in the first instance the arbitration forum.

Over the course of one month, Chase-Switzerland signed three such Option Agreements, each containing the identical arbitration

3

clause.[2]  Chase-Switzerland sent a signed Option Agreement dated March 16, 1995 to PaineWebber with a transmittal cover letter stating that "this document is only valid on a temporary basis." Chase-Switzerland's letter also informed PaineWebber that if it "would like to just trade options on this account or others, we will need to modify the legal doc [sic] which is the Referral Agreement[.]" Chase-Switzerland signed another Option Agreement on March 28, 1995, again with a notation that the Option Agreement would be "valid until April 30, [19]95 <u>only</u>."

Chase-Switzerland did not grant PaineWebber general authority to trade options in the omnibus account until May 2, 1995 (the "May 1995 Authorization").  In the May 1995 Authorization, the parties drew a line through the phrase in the form agreement providing that options transactions would be conducted in accordance with PaineWebber's standard terms and conditions, and typed in its place

---

[2]The parties dispute the authenticity of the first Option Agreement, dated March 3, 1995.  Chase-Switzerland points out that unlike the other two Option Agreements, the March 3 Option Agreement does not contain basic information such as the account title, the PaineWebber branch maintaining the account, the account number, or the PaineWebber broker.  PaineWebber counters that Chase-Switzerland simultaneously faxed both the March 28 Option Agreement, which Chase-Switzerland does not question, and the March 3 Option Agreement, which it does question, to PaineWebber on June 1, 1995.  PaineWebber offers us no explanation for why it would have asked Chase-Switzerland to sign two more Option Agreements if the March 3 agreement had been sufficiently broad in scope and duration.  Nevertheless, as Chase-Switzerland does not expressly deny that it executed the March 3, 1995 Option Agreement, and as our decision does not rely either on its authenticity or the lack thereof, we will assume for the purpose of deciding this appeal that Chase-Switzerland did execute the March 3 Option Agreement.

a provision directing that such transactions be conducted according to the Referral Agreement.

In December 1998, the Lermas instituted arbitration to resolve a claim against PaineWebber, Perusquia, and Lehman Brothers (Perusquia's former employer) before the National Association of Securities Dealers (the "NASD"). The Lermas alleged that Perusquia, acting first as the employee of Lehman Brothers and then as the employee of PaineWebber, defrauded them of more than 80 million dollars. The Lermas' claim advanced multiple theories of liability including fraud, conversion, forgery, theft, breach of fiduciary duty, churning, self-dealing, violation of state and federal securities laws, and breach of contract. PaineWebber and the Lermas agreed to stay the NASD arbitration for 16 months while they attempted to sort out the complex relationships and transactions at issue.

In May 2000, PaineWebber answered the Lermas' claim, filed a cross-claim against Lehman Brothers, and asserted third-party claims against Chase-Switzerland and UBS AG, another Swiss Bank. PaineWebber's claims against Chase-Switzerland arose out of Perusquia's purchase for the Lermas of more than 21 million dollars worth of shares in Northern Orion Exploration ("Northern Orion"), a gold mining company. PaineWebber contends, inter alia, that Perusquia acted outside the scope of his employment in transacting the Northern Orion purchases for the Lermas, and that PaineWebber relied on Chase-Switzerland's representations in permitting

Perusquia to execute the transactions. Chase-Switzerland, in turn, informed PaineWebber in writing on two occasions that it did not believe that the third-party claims were arbitrable, but if they nevertheless proved to be arbitrable, Chase-Switzerland would elect to arbitrate in New York City before the New York Stock Exchange (the "NYSE").

In June 2000, a rapid series of steps was instituted by PaineWebber and the Lermas. First, PaineWebber and the Lermas agreed to place the NASD arbitration on inactive status; almost immediately thereafter, the Lermas initiated an arbitration before the NYSE against PaineWebber, Perusquia, and Lehman Brothers based on the same allegations and theories of liability advanced before the NASD; and, in its equally immediate response filed June 22, 2000, PaineWebber denied all liability and asserted third-party claims against Chase-Switzerland seeking contribution for any liability resulting from the Lermas's allegations that the Northern Orion purchases were unauthorized and unsuitable. In the final step of the series, PaineWebber requested the NYSE to set the arbitration hearing in Houston, Texas. A mere six days later, the NYSE granted PaineWebber's request (not objected to by the Lermas) to hold the arbitration in Houston.

Chase-Switzerland promptly filed a petition in New York state court seeking to stay arbitration of the third-party claims. Chase-Switzerland asserted that it had not agreed to arbitrate these claims; alternatively, that if such claims were arbitrable,

6

they should be arbitrated in New York City.

August 2, 2000 was a busy day for PaineWebber. On that day, PaineWebber (1) as defendant, removed Chase-Switzerland's state-court suit to the Southern District of New York, (2) filed a motion in that court to transfer Chase-Switzerland's suit to the Southern District of Texas, and (3) as plaintiff, filed the instant action in the Southern District of Texas where it was assigned to the Honorable Lynn N. Hughes. Chase-Switzerland objected to the transfer of its New York suit on the ground, inter alia, that the Southern District of Texas lacked jurisdiction over Chase-Switzerland. Likewise, Chase-Switzerland moved to dismiss the suit that PaineWebber filed in Texas as the plaintiff (the case here on appeal) for lack of personal jurisdiction, or, in the alternative, to transfer this case to the Southern District of New York.

Instead, Judge Hughes ordered Chase-Switzerland to arbitrate the third-party claims after concluding that Chase-Switzerland "is within this court's jurisdiction because it agreed to arbitrate in the United States, it elected arbitration through the exchange, and the exchange sent the arbitration to Houston, where PaineWebber has begun to add [Chase-Switzerland] as a third party defendant." Judge Hughes did not specify which of the numerous agreements between the parties was the basis for his ruling that Chase-Switzerland "elected arbitration through the exchange."

On the very same day that Judge Hughes signed the order to compel arbitration in Houston, the district court in New York, over

7

the objection of Chase-Switzerland, granted PaineWebber's motion to transfer Chase-Switzerland's New York suit to the Houston division of the Southern District of Texas, where it was assigned to the Honorable Melinda Harmon. After its suit was transferred to the Southern District of Texas, Chase-Switzerland filed a motion to retransfer the case to New York. PaineWebber opposed the motion and also filed a motion for summary judgment, arguing that the judgment rendered by Judge Hughes works as a res judicata bar to Chase-Switzerland's suit (even though it had been filed in New York before PaineWebber's suit was filed in Judge Hughes's court). Chase-Switzerland responded by filing a cross-motion for a stay of all proceedings in Judge Harmon's court pending this appeal from Judge Hughes's ruling, or in the alternative, requesting that she decide Chase-Switzerland's transfer motion first. To date, all the motions before Judge Harmon are pending.

After Judge Hughes entered the arbitration order in the instant case, Chase-Switzerland timely filed a notice of appeal and sought a stay pending appeal. Judge Hughes denied the stay, after which Chase-Switzerland sought a stay from this court. We too denied the stay, and this appeal followed.

## II.
## ANALYSIS

A. Standard of Review

We review the district court's jurisdictional determinations

8

de novo.[3]  We also review the district court's grant of a motion to compel arbitration de novo.[4]

B.  Personal Jurisdiction

As an initial matter, we note that our analysis is complicated by the interrelatedness of the jurisdictional and substantive issues in this case.  PaineWebber asks us to affirm the district court's ruling that Chase-Switzerland impliedly consented to the district court's jurisdiction by entering into an agreement to arbitrate before the NYSE.  We obviously cannot do so, however, without initially ascertaining that Chase-Switzerland agreed to arbitrate these claims in the first place.[5]  On appeal, PaineWebber urges us to consider two additional bases for the Houston-based court's jurisdiction over Chase-Switzerland that do not depend on the existence of a valid arbitration agreement between the parties. We will begin, therefore, by discussing these alternative grounds for jurisdiction.

1.  Submission to Jurisdiction by Conduct as a Plaintiff

PaineWebber contends that Chase-Switzerland has submitted to the jurisdiction of the Southern District of Texas by its conduct as a plaintiff in the suit currently pending before Judge Harmon.

---

[3]Mink v. AAAA Development LLC, 190 F.3d 333, 335 (5th Cir. 1999).

[4]Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd., 139 F.3d 1061, 1065 (5th Cir. 1998).

[5]It is undisputed that Chase-Switzerland has no other "minimum contacts" with Texas sufficient to satisfy due process.

9

PaineWebber relies on the well-established rule that parties who choose to litigate actively on the merits thereby surrender any jurisdictional objections.[6]  But that rule has no application to the facts of this case.

To reiterate, Chase-Switzerland commenced its suit in state court in New York, and —— after PaineWebber removed to federal court there —— opposed transfer to Texas on the ground that the Southern District of Texas lacked jurisdiction.  Following transfer to the Southern District of Texas after its objection to transfer was overruled, Chase-Switzerland specially appeared for the limited purpose of asking Judge Harmon to retransfer the case to New York, pointing out that it had opposed transfer from New York on the ground that "the Southern District of Texas has no personal jurisdiction over Chase-Switzerland."  When Paine-Webber filed a motion in Judge Harmon's court for summary judgment on grounds of res judicata after Judge Hughes had entered the order to arbitrate, Chase-Switzerland did not respond on the merits, but filed a cross-motion for a stay of the summary-judgment motion and all proceedings in Judge Harmon's court pending this appeal.  When viewed in the light of these facts, PaineWebber's contention that Chase-Switzerland has submitted to the jurisdiction of the Southern District of Texas by "actively litigating" the merits of the arbitrability issue before Judge Harmon is not merely misleading

---

[6]See General Contracting & Trading Co., LLC v. Interpole, Inc., 940 F.2d 20, 23 (1st Cir. 1991).

but is flatly contradicted by the record in that case.[7]

It is no wonder, then, that the cases cited by PaineWebber are inapposite. This is not a case in which the party seeking to avoid the court's jurisdiction has chosen to commence the action or a related action in the very forum in which it is contesting personal jurisdiction;[8] neither is this a case in which the party contesting jurisdiction has asserted counterclaims for affirmative relief;[9] and this is not a case in which a party has litigated extensively on the merits before making any jurisdictional objections.[10] In

---

[7]PaineWebber intimates that Chase-Switzerland's decision not to move for dismissal of its action immediately upon transfer is another indication of its submission to the jurisdiction of the Southern District of Texas. What PaineWebber conveniently fails to mention, however, is that Chase-Switzerland's suit was transferred from New York to Judge Harmon's court after Judge Hughes ruled that "[t]his court has jurisdiction over [Chase-Switzerland]." Thus, it is hardly surprising that Chase-Switzerland would not seek dismissal of its action for lack of personal jurisdiction in light of Judge Hughes's contrary ruling. "By submitting to the jurisdiction of the court for the limited purpose of challenging jurisdiction, the defendant agrees to abide by that court's determination on the issue of jurisdiction: That decision will be res judicata on that issue in any further proceedings." Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 706 (1982). In any event, a motion for transfer is fully consistent with an objection to personal jurisdiction, as a court may transfer a case even though it lacks personal jurisdiction. See Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466 (1962).

[8]See Interpole, 940 F.2d at 21.

[9]See Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 443 (3d Cir. 1999).

[10]See Grupke v. Linda Lori Sportswear, Inc., 174 F.R.D. 15 (E.D.N.Y. 1997) (party contesting jurisdiction had litigated in the transferee court for three years and amended its complaint following transfer to add new defendants).

11

short, neither the law nor the facts justify the exercise of jurisdiction over Chase-Switzerland on the basis of its conduct in its suit before Judge Harmon.

2. Submission to Jurisdiction by Conduct as a Defendant

PaineWebber also contends that Chase-Switzerland has submitted to the jurisdiction of the Southern District of Texas by its conduct in the instant case. More specifically, PaineWebber argues that Chase-Switzerland has waived any objection to personal jurisdiction by seeking the "affirmative relief" of a stay pending appeal and an injunction to prevent PaineWebber from proceeding with arbitration of the third-party claims during the pendency of this appeal.

Paine-Webber is right that a party may waive any jurisdictional objections if its conduct does "not reflect a continuing objection to the power of the court to act over the defendant's person."[11] PaineWebber is also right that when "a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter."[12] But PaineWebber is dead wrong in suggesting that Chase-Switzerland, by making a motion based on the defense of personal jurisdiction, has thereby submitted to the court's jurisdiction.

---

[11]See Alger v. Hayes, 452 F.2d 841, 844 (8th Cir. 1972).

[12]See Bel-Ray, 181 F.3d at 443.

12

Chase-Switzerland timely and properly asserted its jurisdictional objection by making a threshold motion to dismiss for lack of personal jurisdiction. It has asserted no counterclaims and engaged in no third-party practice. It premised its motion for a stay and an injunction pending appeal on the argument that "an improper exercise of personal jurisdiction over Chase-Switzerland constitutes irreparable injury as a matter of law [as a violation of due process]." Try as we might, we cannot see how such actions manifest anything <u>but</u> a "continuing objection" to the district court's exercise of personal jurisdiction over Chase-Switzerland.

Not surprisingly, PaineWebber does not cite, and we have not found, a single case holding that a motion for a stay pending appeal waives an objection to personal jurisdiction. Neither have we found even one case that supports PaineWebber's contention that a defendant submits to the jurisdiction of a court by seeking to enjoin further legal proceedings on the ground that to require participation in such proceedings in the absence of personal jurisdiction would violate due process. Indeed, merely to state this argument is to refute it.

Inasmuch as, in this circuit, the filing of a counterclaim, cross-claim, or third-party claim does not, without more, waive an objection to personal jurisdiction,[13] we cannot fathom how a motion

---

[13]<u>See</u> <u>Bayou Steel Corp. v. M/V Amstelvoorn</u>, 809 F.2d 1147, 1149 (5th Cir. 1987).

13

premised on a jurisdictional objection could simultaneously operate as a waiver of that very objection.  Accordingly, we reject out of hand PaineWebber's argument that Chase-Switzerland, by its conduct in either lawsuit, has submitted to the district court's exercise of personal jurisdiction.

3.  Implied Consent to Jurisdiction

The sole remaining ground urged by PaineWebber for the district court's exercise of personal jurisdiction over Chase-Switzerland is implied consent.  Because the requirement of personal jurisdiction is a waivable right, "there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court."[14]  An agreement to arbitrate is one such "legal arrangement" by which a litigant may impliedly consent to personal jurisdiction.[15]

The Second Circuit, for example, has long held that a party who expressly agrees to arbitrate in one state has impliedly consented to the jurisdiction of the courts in that state, on the theory that only that state's courts have jurisdiction to compel arbitration in that state.[16]  Extending this reasoning, one line of

---

[14]Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473 n.14 (1985) (internal quotation marks and citations omitted).

[15]See Insurance Corp. of Ireland, 456 U.S. at 704 (noting that "lower federal courts have found such consent implicit in agreements to arbitrate").

[16]See Victory Transport Inc. v. Comisaria General de Abastecimientos y Transportes, 336 F.2d 354, 363 (2nd Cir. 1964).

New York cases holds that arbitration clauses that identify an organization before which arbitration may be held, without expressly designating the specific geographic location for the arbitration, may be deemed to imply the parties' consent to the jurisdiction of courts in the state where the arbitral organization is based.[17] Under the logic of these cases, parties who agree to arbitrate before the NYSE or the NASD have impliedly consented to the jurisdiction of courts in New York, where those organizations are based.[18]

The district court extended this reasoning even further by ruling that Chase-Switzerland "is within this court's jurisdiction because it agreed to arbitrate in the United States, it elected arbitration through the exchange, and the exchange sent the arbitration to Houston, where PaineWebber has begun to add [Chase-Switzerland] as a third party defendant." Chase-Switzerland insists, however, that as it never agreed to arbitrate PaineWebber's third-party claims in the first place, its consent to

---

[17]See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Lecopulos, 553 F.2d 842 (2d Cir. 1977); Dain Bosworth, Inc. v. Fedora, No. 92 Civ. 7813 (JSM), 1993 WL 33642 (S.D.N.Y. Feb. 3, 1993); Merrill Lynch, Pierce, Fenner & Smith Inc. v. Noonan, No. 92 Civ. 3770 (SWK), 1992 WL 196741 (S.D.N.Y. Aug. 3, 1992).

[18]We note that another line of New York cases has expressly rejected this reasoning and held that such clauses do not consent to personal jurisdiction at all. See, e.g., Koob v. IDS Financial Services, Inc., 213 A.D.2d 26, 629 N.Y.S.2d 426 (1st Dept. 1995); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McLeod, 208 A.D.2d 81, 622 N.Y.S.2d 954 (1st Dept. 1995); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Barnum, 162 Misc.2d 245, 616 N.Y.S.2d 857 (N.Y. Sup. Ct. 1994).

15

jurisdiction cannot thereby be implied.

Arbitration is "a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."[19]  In determining whether the parties have agreed to arbitrate the dispute in question, we must consider "(1) whether a valid agreement to arbitrate between the parties exists; and (2) whether the dispute in question falls within the scope of that arbitration agreement."[20]  In doing so, we must bear in mind the strong federal policy favoring arbitration and resolve any ambiguity as to the availability of arbitration in favor of arbitration.[21]  Here, PaineWebber contends that Chase-Switzerland agreed in four separate agreements — the Referral Agreement and the three Option Agreements — to arbitrate all disputes with PaineWebber, including the third-party claims.

As to the Referral Agreement, we cannot agree with PaineWebber that the dispute resolution clause in that contract — stating that "any dispute between [Chase-Switzerland] and PaineWebber which cannot be resolved by good faith negotiations shall be submitted to the appropriate arbitrator or court in the United States" — constitutes an agreement to arbitrate, even when read in light of

_____

[19]United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960).

[20]Pennzoil, 139 F.3d at 1065.

[21]See Fedmet Corp. v. M/V Buyalyk, 194 F.3d 674, 676 (5th Cir. 1999).

16

the strong federal policy favoring arbitration.  The Referral Agreement merely provides that the parties will attempt to negotiate any disputes in good faith and, absent a resolution, shall conduct dispute resolution proceedings <u>in the United States</u>.

Importantly, the Referral Agreement does not state that any dispute shall be submitted "either" to arbitration or the courts, as PaineWebber insists.  Rather, it states that disputes between PaineWebber and Chase-Switzerland shall be submitted "to the appropriate arbitrator or court in the United States."  How then, we ask rhetorically, can this provision be deemed a binding agreement to arbitrate any and all disputes (which precludes by its very terms any court resolution) when it identifies "court" and "arbitration" as equals in that very provision?  Significantly, there is no mention of a specific geographic location for arbitration, no selection of an arbitral forum such as the NYSE or the NASD, and no language requiring arbitration.  The dispute resolution clause in the Referral Agreement, then, simply leaves too many critical elements unaddressed to support PaineWebber's contention that the Referral Agreement, standing alone, amounts to a binding arbitration agreement between the parties.

The weakness of PaineWebber's argument becomes even clearer when we compare the dispute resolution clause in the Referral Agreement to the arbitration clauses in the Option Agreements:

> I agree and by carrying an account for me you agree, that any and all controversies which may arise between you and me concerning any account, transaction, dispute or the

17

> construction, performance, or breach of this or any other agreement whether entered into prior, on or subsequent to the date _shall be determined by arbitration_. Any arbitration under this agreement _shall be held under and pursuant to and be governed by the New York Exchange, Inc., or the National Association of Securities Dealers, Inc._

(emphasis added). Unlike this arbitration clause, the dispute resolution clause in the Referral Agreement does not make arbitration compulsory; neither does it so much as mention an arbitral forum, much less a specific geographic location. True enough, the Referral Agreement's dispute resolution clause appears under the heading "INTERPRETATION OF CONTRACT AND ARBITRATION OF DISPUTES," but the mere mention of the word "arbitration" in a contract's section heading cannot a binding arbitration agreement make, especially when, as here, the language of the agreement itself conspicuously lacks any of the universal indicia of an arbitration clause.[22]

---

[22]Compare, _e.g._, Doctor's Associates, Inc. v. Stuart, 85 F.3d 975, 977 (2d Cir. 1996) ("'Any controversy or claim arising out of or relating to this contract or the breach thereof shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association at a hearing to be held in Bridgeport, Connecticut, or whichever city in which the Company is then headquartered[.]'"); Lecopulos, 553 F.2d at 844 n.1 ("'It is agreed that any controversy between us arising out of your business or this agreement, shall be submitted to arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange[.]'"); Merrill Lynch, Pierce, Fenner & Smith Inc. v. Shaddock, 822 F. Supp. 125, 127 (S.D.N.Y. 1993) ("'It is agreed that any controversy between us arising out of your business or this agreement shall be submitted to arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc., or pursuant to the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc., as the

18

Even if we were willing to accept PaineWebber's tortured argument that (1) the Referral Agreement compels Chase-Switzerland to arbitrate this dispute, (2) the NYSE is an "appropriate" arbitrator, and (3) jurisdiction is therefore proper in the Southern District of Texas because that is where the NYSE sent the arbitration between PaineWebber and the Lermas, we would still have to stretch this already strained logic beyond the breaking point to conclude that Chase-Switzerland, a foreign corporation with no other meaningful connection to Texas, impliedly consented to the jurisdiction of the Southern District of Texas by entering into an arbitration agreement that does not even mention an arbitral forum much less designate a geographic location more specific than the entire United States of America. The links of this daisy chain are simply too weak to bind Chase-Switzerland to arbitrate this dispute in the Southern District of Texas.

Neither can we agree with PaineWebber that Chase-Switzerland impliedly consented to jurisdiction in the Southern District of Texas on the basis of the arbitration clauses in the Option Agreements. Certainly, the extremely broad language of these clauses, if read in a vacuum, would appear to bind the parties to arbitrate any and all disputes that may arise between them. When read in context as they must be, however, the reach of the arbitration clauses in the Option Agreements is simply not capable

undersigned may elect.'").

19

of such an expansive grasp.

First, the Option Agreements were executed for short durations and were expressly limited to (1) the purchases of options (2) at the time executed.  Perusquia's purchases of the Northern Orion shares, out of which PaineWebber's third-party claims against Chase-Switzerland arose, had nothing whatsoever to do with options and were not transacted during the effective dates of any of the three Option Agreements.  Second, Chase-Switzerland made clear when it signed the Option Agreements that they in no way modified or superseded the Referral Agreement;[23] similarly, when Chase-Switzerland agreed to the May 1995 Authorization which finally granted PaineWebber general authority to trade options in the account, Chase-Switzerland inserted a clause specifically providing that all such trades would be executed in accordance with the terms of the Referral Agreement, and crossed out a clause in the form agreement providing that PaineWebber's standard terms and conditions, such as the arbitration clauses in the Option Agreements, would control.

Simply put, when read in the context of the dealings between the parties, the number of times the documents were executed, the purposes for their execution, and the nature of the transactions consummated under them, the arbitration clauses in the Option

_____

[23]Likewise, PaineWebber impliedly acknowledged the short fuse on the Option Agreements by requesting that Chase-Switzerland execute a series of such agreements when and as new options transactions were instituted.

20

Agreements, which are strictly limited in both duration and scope, cannot reasonably be interpreted to require Chase-Switzerland to arbitrate PaineWebber's third-party claims arising out of the Northern Orion purchases, none of which had anything to do with options.

## III.

## CONCLUSION

As the district court lacked jurisdiction to enter its order compelling Chase-Switzerland to arbitrate PaineWebber's third-party claims in Houston, we vacate that order and remand with instructions to dismiss this case for lack of personal jurisdiction over Chase-Switzerland.

VACATED and REMANDED with instructions.