**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE DOW CHEMICAL CO.; SHELL
OIL COMPANY; SHELL CHEMICAL
COMPANY,
                    *Plaintiffs-Appellants,*

                    v.

JERONIMO ANIBAL FLORIAN
CALDERON; REYNALDO DIONISIO
GARCIA GOMEZ; ESTEBAN ROBERTO
ROMERO MARTINEZ; JOSE EUGENIO
VIVAS ESPINO; JULIO ALBERTO
CALVO ROJAS; JUAN OBALDO
MARTINEZ GONZALEZ; FRANCISCO
VALERIO GOMEZ MENESES; RENE
JOAQUIN MONTESINO HERNANDEZ;
MARCOS ANTONIO CACERES
MARTINEZ; SANTIAGO CRISTOBAL
MUNG ZAVALA; OSMAR DANILO
ESPINALES REYES; SIXTO TERCERO;
JUAN IRENE VILLALOBOS; RAMIRO
JOSE GARCIA; VENANCIO ANTONIO
HERNANDEZ; JUSTINO NICOLAS
MEDINA; JOEL EPIFANIO CABALLERO
BARRERA; ADOLFINA DEL CARMEN
CANDIA RODRIGUEZ; ADOLFINA DEL
CARMEN CANDIA AGUIRRE; AURA
ESTELA PALMA CASTRO;

No. 04-56582

D.C. No.
CV-04-00356-NM

OPINION

11553

FLORENTINA MARADIAGA
RODRIGUEZ; ALBERTINA ORTEGA
OVIEDO; FILOMENA ZAMORA ROJAS;
LIDIA DEL CARMEN ROMERO
FRANCO; LASTENIA ROGELIO ACUNA
GONZALES,
          *Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
Nora M. Manella, District Judge, Presiding

Argued and Submitted
July 13, 2005—Pasadena, California

Filed August 25, 2005

Before: Stephen Reinhardt, Alex Kozinski, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

**COUNSEL**

Michael P. Foradas, Kirkland & Ellis LLP, Chicago, Illinois, argued the case for the appellants and was on the briefs of the appellants, as attorney for The Dow Chemical Company. Gabriela I. Monahan, Kirkland & Ellis LLP, Chicago, Illinois, and C. Robert Boldt, Rick Richmond, Kirkland & Ellis LLP, Los Angeles, California, and Michael L. Brem, Baker Botts LLP, Houston, Texas, were also on the briefs of the appellants, as attorneys for the same party.

David W. Ogden, Jennifer M. O'Connor, Wilmer, Cutler, Pickering, Hale & Dorr LLP, Washington, DC, and Christo-

pher Tayback, Quinn, Emanual, Urquhart, Oliver & Hedges LLP, Los Angeles, California, were on the briefs of the appellants, as attorneys for the Shell Oil Company and Shell Chemical Company.

Howard Miller, Girardi & Keese, Los Angeles, California, argued the case and was on the briefs for the appellees. Walter J. Lack, Paul A. Traina, Sean A. Topp, Engstrom, Lipsomb & Lack, Los Angeles, California, and Thomas V. Girardi, Girardi & Keese, Los Angeles, California, were also on the briefs of the appellees.

---

## OPINION

BERZON, Circuit Judge:

The Dow Chemical Company, Shell Oil Company, and Shell Chemical Company ("the Companies") sued more than a thousand Nicaraguan citizens ("the Nicaraguans") in federal district court in California. The Companies seek a declaration that (1) they are not liable for any injuries to the Nicaraguans caused by dibromochloropropane, a toxic pesticide commonly known as "DBCP"; and (2) any judgments of Nicaraguan courts to the contrary are not enforceable in this country. The question before us is whether the Nicaraguans consented to personal jurisdiction by either (1) choosing to file suit in Nicaragua under a Nicaraguan law that requires American companies to deposit a specified sum or submit unconditionally to the jurisdiction of U.S. courts; or (2) defending on the merits a declaratory judgment action brought by a different company in the same federal district court concerning the same set of underlying Nicaraguan judgments. The district court rejected both of these contentions. Agreeing with the district court, we hold that the Nicaraguan defendants did not consent to personal jurisdiction in this action.

## I.   FACTUAL AND LEGAL BACKGROUND

The underlying disputes in this case concern whether the Companies are liable for injuries allegedly caused by exposure to DBCP. DBCP was used by fruit and vegetable growers throughout the world in the 1950's, 60's, and 70's. By 1979, use of DBCP in the United States was generally prohibited.

Thousands of plaintiffs, including several Nicaraguans, brought suit in the United States in the mid-1990's against both the manufacturers of DBCP and fruit companies that allegedly continued to use DBCP in developing countries after it was banned in the United States. *See Delgado v. Shell Oil Co.*, 890 F. Supp. 1324, 1335-36 (S.D. Tex. 1995). With respect to the Nicaraguan plaintiffs, the court in *Delgado* determined that Nicaraguan courts offered an adequate and more convenient alternative forum, *see id.* at 1362, and dismissed the suit on *forum non conveniens* grounds. *See id.* at 1372-73.

In 2001, the National Assembly of Nicaragua passed the "Special Law for the Conduct of Lawsuits Filed By Persons Affected By the Use of Pesticides Manufactured with a DBCP Base," known as "Special Law No. 364."[1] Of import to this appeal are two procedural sections, Articles 4 and 7 of Special Law No. 364.

Article 4 requires defendants to deposit "within ninety (90) days after the respective lawsuits have been brought before the courts of [Nicaragua], the sum of one hundred thousand dollars or the equivalent thereof in cordobas . . . as a procedural prerequisite for being able to take part in the lawsuit."[2] Special Law No. 364, art. 4. Relatedly, Article 7 states:

---

[1]The record in this case includes an English translation of Special Law No. 364 from *The Gazette* (January 17, 2001). The parties do not contest the accuracy of this translation. We will quote directly from it.

[2]In addition, Article 8 requires defendants to post a bond of 300 million cordobas (approximately $20 million) to guarantee potential judgments. Special Law No. 364, art. 8.

> Companies that, within ninety (90) days of being given notice of this Law by the plaintiff and service of process through the corresponding channel, have not deposited the sum established in Article 4 hereof, must subject themselves unconditionally to the jurisdiction of the courts of the United States of America for the final judgment of the case in question, expressly waiving the defense of *forum non conveniens* invoked in those courts. In the event that the [companies] decide that the proceedings are to continue in the Nicaraguan courts, they are to deposit the amount established in Article 4 of this Law.

*Id.* art. 7.

Nicaraguans suing under Special Law No. 364 have obtained more than $715 million in judgments against U.S. companies, including The Dow Chemical Company, Shell Oil Company, Shell Chemical Company, and Dole Food Company, many of which were issued without participation by the defendant held liable. Facing potential attempts at enforcement of the various judgments rendered in Nicaragua, Dow Chemical and the two Shell Companies filed a declaratory judgment action against 1,030 named Nicaraguans[3] on January 21, 2004, in the Central District of California. The Companies' First Amended Complaint seeks a declaration that (1) the companies are not liable to the Nicaraguans "for any

---

[3]The companies' First Amended Complaint alleges that the Nicaraguans named as defendants are "among thousands of Nicaraguans who have filed more than 80 lawsuits in various civil courts in Nicaragua." This action, however, is limited to the 1,030 named Nicaraguans, listed in Exhibit B to the First Amended Complaint, involved in seventeen Nicaraguan lawsuits identified in paragraph 9 of the First Amended Complaint. Thus, this appeal does not reach all Nicaraguans who have filed lawsuits under Special Law No. 364 in Nicaragua; for example, while the complaint discusses at length the 466 Nicaraguan plaintiffs in *Franco Franco v. The Dow Chemical Co.*, CV 03-5094 NM (PJWx) (C.D. Cal. filed on Oct. 21, 2003), those individuals were not named as defendants in this suit.

asserted injuries allegedly caused by exposure in Nicaragua to products purportedly manufactured by Plaintiffs;" and (2) that any judgment obtained by the Nicaraguans in Nicaragua is not recognizable or enforceable in the United States. The Nicaraguans moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(2) (lack of personal jurisdiction) and Fed. R. Civ. P. 12(b)(6) (failure to state a claim).

Dole Food Company filed a separate declaratory judgment action against 465 of the 1030 Nicaraguans ("the Managuan defendants") named in this suit. *See Dole Food Co. v. Gutierrez*, No. CV 03-9416 NM (PJWx) (C.D. Cal. filed July 14, 2004). The Nicaraguans in *Dole Food Co.* waived any objection to personal jurisdiction in that case by filing a motion under Fed. R. Civ. P. 12(b)(6). *Id.* The district court in *Dole Food Co.* noted that "[h]ad the issue been raised, it is doubtful that this court would have found a basis to exercise personal jurisdiction over the [Nicaraguans]," *id.* at n.8, and dismissed most of the claims on the 12(b)(6) grounds; Dole Food voluntarily dismissed the remainder of its case.

In this case, the district court granted the Nicaraguans' motion to dismiss for lack of personal jurisdiction, concluding that none of the Nicaraguans had consented to jurisdiction. The Companies appeal.

## II.  PERSONAL JURISDICTION

We review *de novo* the district court's determination that it does not have personal jurisdiction over defendants. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). "Personal jurisdiction over a nonresident defendant is tested by a two-part analysis. First, the exercise of jurisdiction must satisfy the requirements of the applicable state long-arm statute. Second, the exercise of jurisdiction must comport with federal due process." *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1404-05 (9th Cir. 1994). California's long-arm statute, Cal. Civ. Proc. Code § 410.10, allows

courts to "exercise jurisdiction on any basis not inconsistent with the Constitution of [California] or of the United States." This provision allows courts to exercise jurisdiction to the limits of the Due Process Clause of the U.S. Constitution. *See Mattel, Inc. v. Greiner & Hausser GMBH*, 354 F.3d 857, 863 (9th Cir. 2003). Thus, the governing standard here would be whether exercise of personal jurisdiction comports with due process.

**[1]** "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.' " *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). "[T]he test for personal jurisdiction requires that 'the maintenance of the suit . . . not offend traditional notions of fair play and substantial justice.' " *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702-03 (1982) (quoting *International Shoe*, 326 U.S. at 316 (internal quotation marks omitted)) (ellipsis in original).

**[2]** As "[t]he personal jurisdiction requirement recognizes and protects an individual liberty interest," *id.* at 702, "it can, like other such rights, be waived." *Id.* at 703. "[B]ecause the personal jurisdiction requirement is a waivable right, there are a 'variety of legal arrangements' by which a litigant may give 'express or implied consent to the personal jurisdiction of the court.' " *Burger King*, 471 U.S. at 472 n.14 (quoting *Insurance Corp.*, 456 U.S. at 703); *see also Chan*, 39 F.3d at 1406. For instance, "parties to a contract may agree in advance to submit to the jurisdiction of a given court." *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964). "[P]articularly in the commercial context, parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction." *Burger King*, 471 U.S. at 472 n.14. When such understandings "have been obtained through 'freely negotiated' agreements and are not 'unreason-

able and unjust,' their enforcement does not offend due process." *Id.* (quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).

The Companies specifically disavow any contention that the Nicaraguans had sufficient minimum contacts with California to establish specific jurisdiction in compliance with due process. Instead they argue that the Nicaraguans consented to the personal jurisdiction of the district court in two ways: *First,* the Companies maintain that the Nicaraguans' decision to sue under Special Law No. 364 constitutes consent because that law functions like a forum selection clause. *Second*, the Companies contend that the Managuan defendants impliedly consented to personal jurisdiction in this action by defending *Dole Food Co.* on the merits. We address these contentions separately.

## A. Special Law No. 364 As A Forum Selection Clause

**[3]** The Companies' first contention is based on the text of Article 7 of Special Law No. 364. Article 7 provides that defendants sued by a Nicaraguan citizen claiming injuries related to DBCP in a Nicaraguan court either "must subject themselves unconditionally to the jurisdiction of the courts of the United States of America for the final judgment of the case in question," or post the deposit required by the Law as a condition of defending the case in Nicaragua. The Companies suggest that this clause gives them an option to adjudicate the dispute in United States courts if they wish. In light of this option, the Companies argue, the Nicaraguans' choice to sue in Nicaragua under the Special Law constitutes consent to suit in the United States should the Companies choose to invoke the jurisdiction of our courts. While creative, this argument fails for several reasons.

As the Companies concede, it is an "obvious proposition[ ]" that "the Nicaraguan Legislature cannot confer personal jurisdiction over [Nicaraguan citizens] in United States

courts." The "forum selection clause" cases upon which the Companies rely universally concern private, commercial contractual arrangements. *See, e.g., Szukhent*, 375 U.S. at 315-16 (only concerning parties *to a contract*); *Chan*, 39 F.3d at 1406 (referring to the "commercial context").

The Companies attempt to bridge this gap by characterizing the Nicaraguans' decision to sue under Special Law No. 364 as a choice analogous to the choice to consent to a forum selection clause. The suggested analogy between deliberate private decisions regarding the choice of forum expressly recorded as part of a larger agreement, and the implied, government-created choice the Companies ask us to infer is not persuasive.

**[4]** First, as noted above, forum selection clauses are only enforceable where they "have been obtained through '*freely negotiated*' agreements. . . .' " *Burger King*, 471 U.S. at 472 n.14 (emphasis added) (quoting *The Bremen*, 407 U.S. at 15). There was no free negotiation in this instance. The Nicaraguan plaintiffs had no opportunity individually to set up the terms upon which they would litigate against the Companies.

Moreover, the Companies never had a chance to negotiate the terms of Special Law No. 364 either. And, far from seeking to enforce the terms of the Special Law, the Companies are seeking to attack it as fundamentally unfair. As the suit as a whole challenges rather than relies upon the Special Law, there is no basis for treating one provision only as if it were agreed upon among all parties.

Finally, even if there could be instances in which the choice to litigate under a particular foreign statute could provide sufficient assurance of free consent to jurisdiction elsewhere, the text of Special Law No. 364 provides no basis whatever for inferring such consent. Article 7 exclusively addresses the jurisdiction of United States courts over defendant companies

sued under the Special Law, not over the plaintiffs in the cases filed in Nicaragua.

The Companies contend that despite Article 7's complete silence as to the obligations of Nicaraguan citizens, the Nicaraguans should have interpreted it as obligating *all* parties to submit to the jurisdiction of U.S. courts. This reading of the Nicaraguan law lacks any basis in the text.

**[5]** Article 7 is most reasonably read to state that if a company refuses to submit to the jurisdiction of Nicaraguan courts by electing not to deposit the required sum, then it must, *if* sued in the United States, submit unconditionally to the jurisdiction of United States courts, waiving objections to jurisdiction. That is the usual import of the phrase "*subject* themselves . . . to the jurisdiction of the courts of the United States" (emphasis added); one is "subjected" to jurisdiction as a defendant, one invokes jurisdiction as a plaintiff. Also, Article 7 refers to "the *defense* of *forum non conveniens*," (first emphasis added), again indicating that the concern is with assuring that companies sued in Nicaragua will consent to suit in the United States of America if sued there.

This reading of Article 7 comports with the previous history of DBCP litigation brought by Nicaraguan plaintiffs: The corporate defendants successfully sought dismissal of lawsuits in the United States in favor of jurisdiction in Nicaragua. *See Delgado*, 890 F. Supp. at 1372-73. Indeed, Article 3 of Special Law No. 364 specifically refers to these transferred lawsuits.[4] Under this reading, a defendant company has the option

---

[4]Article 3 states in full:

The companies sued in the United States of America, which, because of having chosen to have the lawsuits transferred to Nicaraguan courts, currently are being sued in courts of our country, shall be required to compensate, once the scope of the claim is established in the respective judicial proceeding, with a minimum sum equivalent to One Hundred Thousand American Dollars, or

of posting the requisite bond Article 7 imposes on it and defending the case in the Nicaraguan courts or waiving its otherwise cognizable objections to jurisdiction in the United States.

**[6]** In contrast, nothing in Article 7 appears to impose reciprocal obligations upon the Nicaraguan plaintiffs if sued in the United States. The provision on its face does not cover instances in which companies sued in Nicaragua affirmatively invoke the jurisdiction of our courts, and it does not include any language stating a requirement that the *plaintiffs* in the Nicaraguan actions "subject themselves unconditionally to the jurisdiction of courts of the United States" as defendants.

**[7]** In the face of these omissions, we cannot ascribe to the Nicaraguans a *choice*, by filing suit in Nicaragua under the Special Law, to subject themselves to jurisdiction in the United States at the Companies' option. Rather, the Nicaraguan plaintiffs had every reason to understand Article 7 as putting only the Companies to a choice with jurisdictional consequences.

**[8]** For these reasons, we hold that the Nicaraguans' decision to sue under Special Law No. 364 in Nicaraguan courts does not constitute consent to U.S. jurisdiction. That decision is legally and factually distinguishable from the execution of a valid and enforceable forum selection clause.

---

the equivalent thereof in córdobas at the official rate of exchange in effect at the time of payment of this compensation, depending on the severity of the case, each affected party who filed a complaint in our courts and when it has been verified that the said party's health has been physically or psychologically affected.

## B.  Implied Consent Through Waiver Of Personal Jurisdiction Obligation In Other Litigation

The Companies' other contention concerns the participation of 465 of the Nicaraguans (the Managuan defendants) in *Dole Food Co. v. Gutierrez*, a separate lawsuit. *Dole Food Co.* was a declaratory judgment action brought by a company that is not a plaintiff here, although the action concerns the same underlying Nicaraguan judgments. The Managuan defendants did not object to personal jurisdiction over them in the *Dole* action, but instead filed a dismissal motion under Fed. Civ. P. 12(b)(6) for failure to state a claim.[5] The Companies argue that by failing to object to lack of personal jurisdiction in that suit, the Managuan defendants impliedly consented to personal jurisdiction in *this* action. We reject this argument as well.

The Companies ask us to adopt, for the first time in this circuit, the holdings of two out-of-circuit decisions: *General Contracting & Trading Co. v. Interpole, Inc.*, 940 F.2d 20 (1st Cir. 1991), and *International Transactions Limited v. Embotelladora Agral Regionmontana S.A. de C.V.*, 277 F. Supp. 2d 654 (N.D. Tex. 2002), and suggest that those holdings would be determinative. We assume without deciding that this circuit would follow *Interpole* and *Embotelladora*, but conclude that the analysis contained in those cases does not aid the Companies.

The procedural facts of *Interpole* and *Embotelladora* are similar. In *Interpole*, Interpole sued the Transamerican Steamship Corporation ("Trastco") in a third-party complaint for indemnity. A default judgment issued against Trastco (Suit No. 1). Trastco later brought suit against Interpole in the same federal district court (Suit No. 2), charging fraud and misrep-

---

[5]Although the district court assumed otherwise, the Managuan defendants state in their brief in this court that their submission to jurisdiction in *Dole* was deliberate, as they preferred to litigate on the merits in that appeal.

resentation in connection with the same overall transaction involved in Suit No. 1. 940 F.2d at 21. The First Circuit held:

> Whatever label one might place on Trastco's conduct, it seems pellucidly clear that, by bringing Suit No. 2, Trastco submitted itself to the district court's jurisdiction in Suit No. 1. Trastco elected to avail itself of the benefits of the New Hampshire courts *as a plaintiff*, starting a suit against Interpole. By so doing, we think it is inevitable that Trastco surrendered any jurisdictional objections to claims that Interpole wished to assert against it in consequence of the same transaction or arising out of the same nucleus of operative facts.

*Id.* at 23 (footnote omitted).

In *Embotelladora*, Sharp Capital, Inc., purchased a promissory note entered into by Agral, a Mexican corporation. 277 F. Supp. 2d at 658. Agral defaulted on the promissory note, and Sharp initiated arbitration proceedings. *Id.* In response, Agral filed two suits against Sharp in the Northern District of Texas. *Id.* at 659. When Sharp ultimately won an arbitration award of more than $11 million, Sharp's assignee sued Agral to enforce payment of the Award. *Id.* Agral moved to dismiss for lack of personal jurisdiction. *Id.* Citing to *Interpole*, the Northern District of Texas determined that by filing a complaint against Sharp concerning the same transaction (the promissory note for the bottling plant), Agral *affirmatively* sought relief from the same court concerning the same transaction or occurrence they were defending against; the court therefore denied Agral's motion to dismiss for lack of personal jurisdiction. *Id.* at 667-69.

[9] Taken together, these two cases establish an affirmative relief rule, specifying that personal jurisdiction exists where a defendant also independently seeks *affirmative* relief in a separate action before the same court concerning the same

transaction or occurrence. Such action "may take place prior to the suit's institution, or at the time suit is brought, or after suit has started." *Interpole*, 940 F.2d at 22 (internal citations omitted).

[10] The Companies' argument here is limited to addressing only consent-based jurisdiction; as noted, they expressly disavow any argument for personal jurisdiction on the basis of "minimum contacts" specific jurisdiction.[6] *Interpole*, however, at least in part addresses specific jurisdiction, as it invokes the language pertinent to that doctrine. *See* 940 F.2d at 24 ("Upholding the forum court's assumption of jurisdiction over Trastco in Suit No. 1 seems a small price to exact for allowing Trastco purposefully to avail itself of the benefits of a New Hampshire forum as a plaintiff in Suit No. 2."). Similarly, *Embotelladora* uses a specific jurisdiction "minimum contacts" analysis; it does not speak at all of consent-based jurisdiction. *See* 277 F. Supp. 2d at 666-69. It thus appears to us that *Interpole* and *Embotelladora* rest primarily on the conclusion that there is nothing unfair, or violative of due process, about requiring a party that has affirmatively sought the aid of our courts with regard to a particular transaction to submit to jurisdiction in the same forum as a defendant with regard to the same transaction with the same party.

[11] As noted, the Companies here have expressly eschewed any "minimum contacts" specific jurisdiction analysis, and rest only on the contention that the Managuan defendants have consented to suit. As for the contention that *has*

---

[6]"Where a forum seeks to assert specific juridiction over an out-of-state defendant who has not consented to suit there," due process is satisfied if the defendant has established "minimum contacts" with the forum such that (1) "the defendant has 'purposefully directed' his activities at residents of the forum," (2) "the litigation results from alleged injuries that 'arise out of or relate to' those activities," and (3) the exercise of jurisdiction is reasonable. *See Burger King*, 471 U.S. at 472, 477 (internal citations omitted); *see also Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).

been raised — that the defense on the merits in the *Dole* action constituted consent by the Nicaraguans to the present action — we hold that defense on the merits in a suit brought by one party cannot constitute consent to suit as a defendant brought by different parties. As we have noted above, it is doubtful that a party could demonstrate consent solely through an *Interpole/Embotelladora*-like contact. Even if we were to conclude otherwise, however, we would not stretch those cases to cover this one.

*Interpole* and *Embotelladora* rely upon the fact that the party objecting to jurisdiction (the Nicaraguans in this case) was also *affirmatively* availing itself of the relevant forum. *See Interpole*, 940 F.2d at 23; *Embotelladora*, 277 F. Supp. 2d at 668. *Interpole*, moreover, places emphasis on the phrase "*as a plaintiff*" in encapsulating its holding. 940 F.2d at 23.

This requirement that the party defendant objecting to personal jurisdiction have acted affirmatively to seek the aid of courts in the relevant forum has been underscored in both of the later characterizations of *Interpole* by the First Circuit. *See Martel v. Stafford*, 992 F.2d 1244, 1248 (1st Cir. 1993) (characterizing *Interpole* as "ruling that a plaintiff who *purposefully avails* himself of a particular forum surrenders jurisdictional objections to claims arising out of the same transaction that are brought against him in the same forum" (emphasis added)); *Precision Etchings & Findings, Inc. v. LGP Gem Ltd.*, 953 F.2d 21, 25 (1st Cir. 1992) (citing *Interpole* for the idea that "implied submission" to jurisdiction occurs when a party "bring[s] independent action" to "seek affirmative relief"). The two other circuits to address *Interpole* are in accord with this interpretation. *See Rates Tech. Inc. v. Nortel Networks Corp.*, 399 F.3d 1302, 1308 n.5 (Fed. Cir. 2005) (noting the filing of suit as important to that ruling); *PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453, 460 & n.8 (5th Cir. 2001) (describing *Interpole* as a case "in which the party seeking to avoid the court's jurisdiction has chosen to *commence the*

*action or a related action* in the very forum in which it is contesting personal jurisdiction" (emphasis added)).

**[12]** Here, the Managuan defendants have only *defended* against two separate actions concerning a single foreign judgment in the same court. It is true that the Nicaraguans made a choice in the *Dole* action to defend on the merits. But that choice was made only *after* they were haled into the district court by Dole. Without an independent affirmative decision to seek relief in our courts, there can be no imputation of a conscious decision to settle all aspects of a dispute here.

Moreover, this case does not implicate the "unjust asymmetry" that occurs with "allowing a party . . . to enjoy the full benefits of access to a state's courts *qua* plaintiff, while nonetheless retaining immunity from the courts' authority *qua* defendant in respect to claims asserted by the very party it was suing." *Interpole*, 940 F.2d at 23. Here, we have multiple plaintiffs suing the same set of Nicaraguan defendants in separate suits. That the defendants won on the merits in one suit and won on a jurisdictional objection in the other is not the asymmetry that concerned the *Interpole* court.

**[13]** We therefore hold that the Managuan group of 465 Nicaraguans did not consent to jurisdiction in this action by waiving their personal jurisdiction objection in the *Dole* declaratory judgment action.

## III.   CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of the action for lack of personal jurisdiction.