# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 1, 2022

Lyle W. Cayce
Clerk

No. 21-30358

Susan Lafaye; Lisa Picone; Inez Victorian,

*Plaintiffs—Appellees*,

*versus*

City of New Orleans,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Eastern District of Louisiana
No. 2:20-CV-41

---

Before Smith, Elrod, and Oldham, *Circuit Judges*.*

Jerry E. Smith, *Circuit Judge*:

Since 2019, the plaintiffs have been waiting for the City of New Orleans to return traffic fines that it illegally collected from them between 2008 and 2010. They will have to keep waiting. The plaintiffs allege a taking based on the city's failure to honor a judgment of the Louisiana state courts, but we conclude that the failure to honor a judgment does not constitute a taking—even when that judgment calls for the return of personal property acquired by a government unlawfully. We answer the certified question in the

---

* Judge Oldham concurs in the judgment.

negative and remand for further proceedings.

I.

In 2008, the city implemented a program called the Automated Traffic Enforcement System ("ATES"), which used mail to collect fines for traffic violations captured by street cameras. It was initially administered not by the New Orleans Police Department but by the city's Department of Public Works ("DPW").

In 2010, a group of plaintiffs brought a class action challenging the legality of ATES. Later that year, a state court preliminarily enjoined the program, determining that, under state law, the city likely had no authority to delegate ATES enforcement authority to the DPW. In response, the city amended the program to transfer enforcement to the police department.

That solved the problem of ATES's legality but left the question of what would become of the fines that had been collected by the DPW in the meantime. In 2018, the Louisiana trial court resolved that issue in favor of the plaintiffs, ordering the city to "immediately refund" the relevant fines and fees. The Court of Appeal affirmed, *McMahon v. City of New Orleans*, 2018-0842 280 (La. App. 4 Cir. 9/4/19); 280 So. 3d 796, noting that ATES was "void *ab initio*" and that the plaintiffs were therefore entitled to reimbursement of the fines exacted before it was cured in 2010, *id.* at 799–801. The Louisiana Supreme Court denied certiorari. *McMahon v. City of New Orleans*, 2019-01562 (La. 11/25/19); 283 So. 3d 498.

New Orleans still has not reimbursed the fines. Two days after the denial of certiorari, the city issued a statement promising to pay "subject to an appropriation," as it does with all court judgments. But the amount, totaling $35 million (including $10 million in interest) at the time of judgment, is substantial, and New Orleans tends to be less than prompt in the payment of judgments. At oral argument, counsel for the city stated that the city's

unpaid judgments stretch back "over a decade."[1]

Hoping to avoid that wait, the plaintiffs brought this action in the Eastern District of Louisiana on January 6, 2020, some six weeks after the denial of certiorari. The plaintiffs alleged that the city had violated the Fifth and Fourteenth Amendments by confiscating their property and keeping it without just compensation. Under the plaintiffs' theory, the taking arose not when their money was initially confiscated, but instead when the city refused to return that money immediately in response to the final judgment in *McMahon*.

New Orleans moved to dismiss for failure to state a claim. It maintained that civil fines, such as those imposed by ATES, are not takings, and it also raised several procedural arguments that are not now before us. The district court, however, disagreed. It denied the motion to dismiss, concluding that the plaintiffs had properly stated a 42 U.S.C. § 1983 claim against the city. New Orleans brought an interlocutory appeal under 28 U.S.C. § 1292(b). It certified one question,[2] which we now address: whether the failure to comply with a state court judgment may be construed as a taking.

## II.

The Fifth Amendment, incorporated against the states by the Fourteenth, provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. The precise scope of what constitutes a taking is often disputed, but courts have articulated several principles relevant to the plaintiffs' theory.

---

[1] Oral Argument at 13:39–50.

[2] New Orleans also presents a second question in its briefing: "Whether money judgments against political subdivisions in Louisiana entitle plaintiffs to payment at a particular time." The parties dispute whether we may answer such an uncertified question, but we do not address that issue because the second question proves irrelevant to the case in its current posture.

First, takings are generally effected through the power of eminent domain. *See, e.g.*, *First Eng. Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 316 (1987). Though governments can effect regulatory takings through less "formal" means, *see id.*, these plaintiffs do not bring a regulatory takings claim. Thus, in cases like this one, "[t]he government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain." *Bennis v. Michigan*, 516 U.S. 442, 452 (1996). For instance, where a government seizes and destroys property incident to a valid use of its police power, no taking occurs. *Johnson v. Manitowoc County*, 635 F.3d 331, 336 (7th Cir. 2011). In this case, New Orleans acquired the plaintiffs' money not through eminent domain nor through any other lawful power, but rather through *ultra vires* implementation of ATES. That posture makes this case unlike prototypical takings actions.

The illegal nature of ATES also presents a more serious problem. A second key feature of takings is that, when properly compensated, they are entirely lawful. *See First Eng.*, 482 U.S. at 314. Thus, "if a government action is found to be impermissible . . . that is the end of the inquiry." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). "No amount of compensation can authorize such action." *Id.* A victim of lawless government action can, of course, seek compensation in the form of damages or equitable relief, just as those fined under ATES did in the *McMahon* litigation. But to allege a cognizable takings claim, a plaintiff must challenge action that would have been legal if only it had been compensated. *See, e.g.*, *Knick v. Township of Scott*, 139 S. Ct. 2162, 2168 (2019). That is not how Louisiana's courts understood the collection of fines under ATES.

Putting those principles together, an exaction of money that is completely unlawful, whether compensated or not, is not a taking. That conclusion finds support in the law of taxes. When the federal government levies a tax that is later determined to exceed its legal authority, it does not effect a

taking. *See, e.g.*, *U.S. Shoe Corp. v. United States*, 296 F.3d 1378, 1383–84 (Fed. Cir. 2002). Similarly, New Orleans exacted money using an enforcement power that was later deemed *ultra vires*. Though the city was seeking to exercise its police power rather than Congress's taxing authority, the analogy is strong enough to bolster our conclusion that the implementation of ATES does not constitute a taking.

Moreover, the plaintiffs' taking theory suffers from a logical contradiction. They advance two propositions: The taking did not arise until the moment the *McMahon* judgment became final, and it arose only because the money was *initially* taken with no claim of right. Both contentions are necessary—to relitigate the initial extraction of fines under ATES would raise serious *res judicata* concerns, while fixating on the city's failure to return the money would turn all money judgments against governments into takings. But in their attempt to avoid those pitfalls, the plaintiffs find themselves trying to have their cake and eat it too. They conceive of the city as "taking" their money in 2019, even when that money had been in the city's possession since 2010 at the latest. And they insist that the city's conduct from 2008 to 2010 was necessary to effect a taking that did not actually arise until 2019. Such a theory sits uneasily with a linear conception of time and is not rooted in the text of the Fifth Amendment.

## III.

The plaintiffs' argument to the contrary rests primarily on *Vogt v. Board of Commissioners*, 294 F.3d 684 (5th Cir. 2002). That case concerned land that had been expropriated from private owners to build a spillway. *Id.* at 687. In 1984, Louisiana passed a statute requiring the return of the lands; the levee board nonetheless dragged its feet until 1991, meanwhile collecting royalties from mineral interests in the land. *Id.* Louisiana courts then ordered the levee board to hand over the value of the royalties it had gained between 1984 and 1991. *Id.* at 688. The board failed to do so. *Id.* The landowners deemed that failure a taking, while the board contended that the dispute was

"merely an attempt to execute the judgment of the state courts." *Id.* at 697. A panel of this court did not reach the takings issue, but it did reject the board's theory.

The plaintiffs maintain that *Vogt* is similar to this case, but the parallels they point to are superficial. The *Vogt* plaintiffs did assert that "the levee board's refusal to pay the judgment is an unconstitutional taking of their property without just compensation," *id.* at 688—essentially the same legal theory as that advanced by the plaintiffs here. Panels of this court have sometimes, in *dicta*, read *Vogt* as ratifying that theory, though those panels have not themselves adopted it. *See Ariyan, Inc. v. Sewerage & Water Bd.*, 29 F.4th 226, 231 (5th Cir. 2022).[3]

Although this court ruled for the *Vogt* plaintiffs, that does not mean we adopted every aspect of their reasoning.[4] To the contrary, we stressed that we were resolving "only [one] point": whether "a decree of the Louisiana courts somehow converted private property . . . into public funds subject to an unenforceable lien." *Vogt*, 294 F.3d at 697. We held that it did not. But that does not mean that the government's refusal to return property would *itself* constitute a taking if the property had never been taken in the first place.

---

[3] *Ariyan* also noted, correctly, that the district court's opinion in this case "turns on the exact same distinction" as the plaintiffs' reading of *Vogt*. *Ariyan*, 29 F.4th at 231. But contrary to the plaintiffs' protestations, *Ariyan*'s citation to the district court's opinion does not cabin our review of that opinion. *Ariyan* did not purport to adopt the district court's reasoning but, instead, only noted that it was inapplicable to those facts. *Id.*

[4] Indeed, *Ariyan* did not assign binding status to the relevant part of *Vogt*, which it described as "*dicta.*" *Id.* at 231. *But see Haspel & Davis Milling & Planting Co. v. Bd. of Levee Comm'rs*, 493 F.3d 570, 575–77 (5th Cir. 2007) (appearing to treat the relevant portion of *Vogt* as binding). The plaintiffs' application of the rule of orderliness thus gives rise to a catch-22: If *Ariyan*'s discussion of *Vogt* is *dicta*, it is nonbinding. If *Ariyan*'s discussion is binding, then Vogt is *dicta*, and therefore nonbinding.

Either way, we are not required to accept the plaintiffs' preferred reading of *Vogt*. We instead accept the reading described below and, because that reading does not compel the result in this case, we have no occasion to address whether the relevant section of *Vogt* is *dicta*.

We confirmed that our holding did not resolve the outcome of the *Vogt* plaintiffs' takings claim but merely rejected the defense that a judgment had altered the nature of the property interest in question. *See id.* at 696–97.[5]

That reading of *Vogt* comports with the broader principles of takings law described above and with the unique factual background of that case. The property at issue in *Vogt* was personal property—money that had been collected as royalties years before the case reached this court. *See id.* at 687. But those royalties had been collected per land-based mineral interests, meaning they were ultimately traceable to real property that the state had expropriated under its power of eminent domain. *Id.* By retaining the land in question for several years longer than it should have and collecting royalties on it, the levee board exposed itself to a plausible, if not quite airtight, takings claim. We did not resolve that claim but did conclude that its viability was not extinguished by the state court judgment ordering the return of the royalties.

*Vogt* thus provides little help to the plaintiffs. A judgment does not alter the fundamental nature of the interest it protects. Though the outcome of the *McMahon* litigation did not render the plaintiffs' money immune to a takings claim, neither did it give rise to a takings claim that did not previously exist. That conclusion makes intuitive sense—as stated previously, it is odd to conceive of a government as instantly "taking" property, especially property as fungible as money, that has been in its actual possession for years. And as the plaintiffs admitted at oral argument,[6] their theory gives rise to no limiting principle—it would allow plaintiffs in a case like this to bring a federal takings claim the day after receiving a favorable judgment, even if the defen-

---

[5] We did note that "[o]ur holding extends only to cases where . . . the government has forcibly appropriated private property without a claim of right or of public or regulatory purpose." *Vogt*, 294 F.3d at 697. But we made that observation to stress that our conclusion was limited to judgments for the return of property, as distinguished from money judgments. Read in that context, the sentence does not imply that our holding recognized a taking in *all* cases in which a government lawlessly appropriates property.

[6] Oral Argument at 20:22–37.

dant were acting quickly and diligently to return the plaintiffs' property.

That conclusion defeats the plaintiffs' theory that a taking arose when New Orleans failed to pay the *McMahon* judgment. The plaintiffs do not—and, for the reasons explained above, could not—argue that the extraction of fines under ATES was a taking. Thus, despite *Vogt*, they are left with no plausible allegation that the city has effected a taking of their property.

We answer in the negative the certified question whether the failure to comply with a state court judgment may be construed as a taking. The matter is REMANDED for further proceedings as appropriate.