# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 9, 2024

Lyle W. Cayce
Clerk

No. 23-10726

---

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff*,

*versus*

STANFORD INTERNATIONAL BANK, LIMITED, *et al.*,

*Defendants*,

HUGH DICKSON; MARK MCDONALD, *in their capacities as the Foreign Representatives and Joint Liquidators of the bankruptcy estate of* STANFORD INTERNATIONAL BANK, LIMITED,

*Appellants*,

*versus*

RALPH S. JANVEY, *in his capacity as the Court-appointed Receiver for* THE STANFORD RECEIVERSHIP ESTATE; OFFICIAL STANFORD INVESTORS COMMITTEE; SOCIETE GENERALE PRIVATE BANKING (SUISSE) S.A.,

*Appellees*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:09-CV-298

Before Higginson, Willett, and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:

For years, Robert Allen Stanford ran a billion-dollar Ponzi scheme through various Texan and Antiguan entities. In 2009, a federal district court approved an equity receiver (the "Receiver") to handle claims from defrauded investors, manage the assets of the Stanford entities, and bring claims against allegedly complicit third parties.

This appeal arises from a settlement with one of those third parties, Societe Generale Private Banking (Suisse) S.A ("SGPB"). As part of that settlement, the district court entered a bar order that enjoined the world from bringing future Stanford-related claims against the Swiss bank. But two individuals appointed by an Antiguan court to handle the liquidation of one of the Stanford entities contend that the bar order should not extend to their claims against SGPB. We hold that the district court did not have the requisite personal jurisdiction to bind the Joint Liquidators with its bar order.

I

This is not the first time that this court has confronted an appeal related to the Stanford Ponzi scheme. *See, e.g.*, *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883 (5th Cir. 2019); *SEC v. Stanford Int'l Bank, Ltd.* ("*Lloyd's*"), 927 F.3d 830 (5th Cir. 2019); *United States v. Stanford*, 805 F.3d 557 (5th Cir. 2015); *Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185 (5th Cir. 2013). At the risk of re-tilling well-tilled ground, we (A) briefly outline the context for the establishment of the equity receivership. We then (B) detail the origin of the Joint Liquidators and their conflicts with the Receiver. Finally, we (C) discuss the events giving rise to the specific settlement with SGPB and resulting bar order.

A

For almost a decade, Robert Allen Stanford ran an elaborate Ponzi scheme. *See Janvey*, 712 F.3d at 188–89. Stanford sold high-return certificates of deposit ("CDs") to investors and used new investments to fund redemptions of matured CDs. *See Brown*, 767 F.3d at 433. The bank that originated these CDs, Stanford International Bank, Ltd. ("SIBL"), was based in Antigua. Stanford and many of the other key entities involved in the Ponzi scheme were based in Houston, Texas. *See Stanford*, 805 F.3d at 563–64.

When the 2008 financial crisis led to decreased CD sales and increased redemptions, the scheme collapsed. *See Zacarias*, 945 F.3d at 890. Thousands of defrauded investors lost billions. *Ibid.*

On February 17, 2009, the SEC brought an action for securities fraud in the Northern District of Texas against Stanford and several of his companies, including SIBL.[1] The same day and in the same proceeding, the district court took exclusive jurisdiction of all the Stanford assets, including SIBL, and appointed Ralph Janvey as the Receiver with the "full power of an equity receiver under common law" and such powers as were enumerated in the district court's order. ROA.621–22.

As relevant here, the Receiver was empowered to collect and manage the assets and records of the receivership estate, sue persons or entities that improperly received assets traceable to the receivership estate, deal with claims against the receivership estate (*e.g.*, from the defrauded investors), and perform all tasks necessary to administer the receivership estate. *See*

---

[1] Stanford was later convicted by a jury on 13 counts of fraud and fraud-related crimes and sentenced to 110 years in jail. On appeal, this court affirmed his conviction and sentence. *See Stanford*, 805 F.3d at 572.

ROA.621–26; *see also Janvey*, 712 F.3d at 189 (describing the Receiver's role as to "preserve the Stanford corporations' resources and pursue the corporations' assets that were in the hands of third parties as the result of fraudulent conveyances"). The district court also ordered the Stanford defendants to provide the Receiver with control and possession of any receivership assets and, as necessary, to transfer all foreign receivership assets to American soil.

B

On February 26, 2009, nine days after the district court appointed Janvey as the U.S. Receiver, an Antiguan court appointed two receivers over SIBL and Stanford Trust Company Limited ("STCL"), another Antiguan-based Stanford entity. The Antiguan court effectively ordered these joint receivers to do exactly what Janvey had been ordered to do by the American district court, but with respect only to SIBL and STCL.

Two months later, the Antiguan court converted the receivership proceeding into a liquidation and appointed joint liquidators to retrieve SIBL and STCL's assets for the benefit of their creditors. After the initial pair of joint liquidators were alleged to have engaged in improper practices, the Antiguan court replaced them in 2011 with two new joint liquidators: Marcus Wide and Hugh Dickson. Although the record is unclear, it appears that Mark McDonald replaced Wide as one of the liquidators at some point. Dickson and McDonald are the appellants in this case (the "Joint Liquidators").

With respect to SIBL and STCL, the Receiver and the Joint Liquidators were tasked with the same responsibility: retrieving assets and pursuing legal claims on behalf of creditors. *Cf.* ROA.97510 (the district court noting that "the Antiguan court basically did a mirror-image order blessing the Joint Liquidators to do the same thing" as the Receiver). Unsurprisingly,

the parties repeatedly came into conflict. For example, the Receiver and the Joint Liquidators competed over recognition before courts in Canada. The Joint Liquidators objected to criminal proceedings in multiple jurisdictions. And they constantly asserted that the American proceeding should be converted into a liquidation.

The parties also fought over the relationship between their two proceedings as a matter of American law. The Joint Liquidators petitioned the district court to recognize the Antiguan liquidation of SIBL as a "foreign main proceeding" under Chapter 15.[2] *See* 11 U.S.C. § 1520. That designation would have placed the Joint Liquidators in the driver's seat with respect to SIBL's assets, effectively demoting the Receiver.[3] In 2012, the district court declined the Joint Liquidators' request, instead designating the Antiguan proceeding as a "foreign non-main proceeding." ROA.48031.

The Joint Liquidators appealed the district court's disposition of their Chapter 15 petition. But before this court decided that appeal, the parties settled their differences in a 2013 Settlement Agreement and Cross-Border Protocol. Article 3 of the Protocol was entitled "LITIGATION PROTOCOL," and Section 3.1 was entitled "CLAIMS TO BE PURSUED INDEPENDENTLY." ROA.48772. The Receiver and the Joint Liquidators agreed they could each "pursue and initiate claims in

---

[2] The Joint Liquidators didn't ask for Chapter 15 recognition of the Antiguan proceeding involving STCL, and STCL's assets or claims are not relevant to this dispute.

[3] *See In re SPhinX, Ltd.*, 351 B.R. 103, 115 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007) ("[U]pon recognition of the foreign proceeding as a 'foreign main proceeding,' (a) the automatic stay under Bankruptcy Code section 362 . . . applies with respect to the debtor and its property within the territorial jurisdiction of the United States, (b) sections 363, 549 and 552 of the Bankruptcy Code apply to restrict the ability to transfer such property absent court approval, and (c) unless the court orders otherwise, the foreign representative may operate the debtor's business and exercise the rights and powers of a trustee under Bankruptcy Code sections 363 and 552.").

jurisdictions in which they are recognized." *Ibid.* The Receiver, Joint Liquidators, and other parties signed the Protocol, and the district court approved it in a court order. ROA.49792 (the "Protocol Order"). Under the Protocol Order, the Receiver pursued Stanford-related claims in jurisdictions like the United States where he was recognized and the Joint Liquidators were not. And the Joint Liquidators pursued Stanford-related claims in jurisdictions like Switzerland where they were recognized and the Receiver was not.

In 2018, however, things broke down again. In that year, the Receiver attempted to settle its Stanford-related claims against Proskauer Rose LLP in the United States. As part of that settlement, the Receiver and Proskauer proposed that the district court would enter a global injunction barring *all* claims against Proskauer—including the Joint Liquidators' claims pending in Antigua. The district court entered that order. The Joint Liquidators did not consider themselves bound by it because they had never consented to the district court's jurisdiction, had never participated in the Receiver's settlement with Proskauer, and were not parties to the United States litigation. Proskauer then moved for contempt in the United States because the Joint Liquidators refused to consent to the district court's global bar order.

The Joint Liquidators then responded in the district court's Chapter 15 action, arguing the federal court had no personal jurisdiction over them. The district court agreed with the Joint Liquidators. It held that it "lack[ed] jurisdiction to enjoin the Joint Liquidators" because they were "not parties to the suit," "were not a part of the [Proskauer] settlement agreement or Bar Order," and were not subject to the court's jurisdiction for any purpose besides their Chapter 15 petition for recognition of the Antiguan bankruptcy. *Janvey v. Proskauer Rose LLP*, No. 3:09-CV-721-N-BQ, 2020 WL 418884, at *3–4 (N.D. Tex. Jan. 24, 2020).

C

This case is a redux of the parties' dispute over the Proskauer settlement.

In the wake of the district court's holding that the Proskauer bar order did not apply to the Joint Liquidators or their litigation against that law firm in Antigua, the Joint Liquidators and Receiver again conferred over the Protocol Order. The parties again agreed they would independently pursue their litigation efforts in the jurisdictions where they were recognized. Janvey confirmed that he was "refused recognition as a representative of [SIBL] in Switzerland," so he would not pursue litigation there. AX.433. Contrariwise, the Joint Liquidators *were* recognized in Switzerland, so they would independently pursue claims against SGPB in that country.

That détente held for fourteen months. Then, as he did with Proskauer, Receiver Janvey attempted to bar the Joint Liquidators' lawsuits pending outside of the United States. Specifically, the Receiver and SGPB proposed to the district court a settlement and bar order that would "permanently bar[], restrain[], and enjoin[]" the Joint Liquidators from continuing their Swiss suit against SGPB. ROA.95145, ¶ 10; ROA.97559 (final bar order).

After the parties moved for approval of the settlement and the SGPB bar order, the district court entered a scheduling order. The court preliminarily approved the settlement and required the parties to provide notice of the settlement to interested parties like the Joint Liquidators. In the scheduling order, the district court also instructed that anyone wishing to object to the settlement must object in the docket of the main SEC action where it had appointed the Receiver (No. 3:09-CV-298-N). The district court further instructed that anyone who submitted such an objection would be deemed to have submitted to the jurisdiction of the district court for

purposes of the settlement and related bar order. ROA.95282. Anyone who did not thus submit an objection would be deemed to have waived any objection and forever barred from objecting. ROA.95282 (providing that such silent objectors "shall be forever barred from raising such objections in this action or any other action or proceeding").

The Joint Liquidators objected—but they refused to do it in the main SEC action (No. 3:09-CV-298-N). They instead objected in the Chapter 15 docket where they had successfully objected to the Proskauer bar order (No. 3:09-CV-721-N). In that objection, the Joint Liquidators attacked the bar order on jurisdictional and merits grounds. The Receiver filed a response to the Joint Liquidators' objection, also in the Chapter 15 docket. And the Joint Liquidators replied to the Receiver's response.

The district court then held a hearing. At that hearing, the court noted that the Joint Liquidators had counsel present. Then the district court told counsel for the Joint Liquidators that if they said anything more than "good morning," the court would take that as a general appearance waiving any objection to personal jurisdiction over the Joint Liquidators. ROA.99289. Counsel was silent, the settlement was approved, and a bar order was entered by the district court.

The Joint Liquidators timely appealed.

## II

While briefing their positions before this court, the parties filed three opposed motions. We address each in turn.

## A

The Receiver moved to dismiss the appeal for lack of appellate jurisdiction on the theory that non-parties to a judgment (like the Joint Liquidators here) cannot appeal from it. True, non-parties generally cannot

appeal a court's judgment. *Castillo v. Cameron Cnty.*, 238 F.3d 339, 349 (5th Cir. 2001). But this court has clearly held that, if an injunction extends to non-parties, "they may appeal from it." *See, e.g.*, *United States v. Chagra*, 701 F.2d 354, 359 (5th Cir. 1983); *see also Castillo*, 238 F.3d at 349 (citing multiple cases where a court blessed the ability of a non-party to appeal an injunction instead of waiting for a contempt proceeding). Since the SGPB bar order operates as an injunction that extends to the Joint Liquidators, they may appeal from it. So the Receiver's motion is DENIED.

## B

The Joint Liquidators moved to amend the caption of the case to correct the spelling of SEC's party name (from "Security" to "Securities"), remove the words "et. al" from SEC's caption, and add to their caption the title "Foreign Representatives and Joint Liquidators of the bankruptcy estate of Stanford International Bank, Ltd." These corrections accurately reflect the parties in this proceeding. So the Joint Liquidators' motion is GRANTED.

## C

Finally, the Joint Liquidators asked the court to supplement the record on appeal with documents from the Chapter 15 proceeding, including their objection to the SGPB settlement and bar order. We have "ample authority" to supplement the record with relevant documents. *See, e.g.*, *Phillips Petroleum Co. v. Williams*, 159 F.2d 1011, 1012 (5th Cir. 1947). And the Joint Liquidators' activity in the Chapter 15 proceeding is relevant to our analysis in this opinion. So the Joint Liquidators' motion is GRANTED.

## III

A district court has broad powers and wide discretion to determine appropriate relief in an equity receivership. *See SEC v. Safety Fin. Serv., Inc.*,

674 F.2d 368, 372–73 (5th Cir. 1982) (citation omitted). Therefore, the district court's "entry of a bar order, like other actions in supervising an equity receivership, is reviewed for abuse of discretion." *Lloyd's*, 927 F.3d at 839. In the context of reviewing legal questions, the abuse of discretion standard "is effectively *de novo*, because a district court by definition abuses its discretion when it makes an error of law." *United States v. Delgado-Nuñez*, 295 F.3d 494, 496 (5th Cir. 2002) (quotation omitted and alteration adopted). "Personal jurisdiction is a question of law . . . ." *Admar Int'l, Inc. v. Eastrock, LLC*, 18 F.4th 783, 786 (5th Cir. 2021).

We first (A) explain why the district court's *in rem* jurisdiction over the receivership estate does not support the bar order's application to the Joint Liquidators. We then (B) hold the district court also lacked the necessary *in personam* jurisdiction.

## A

First, *in rem* jurisdiction. In its receivership order, the district court assumed exclusive jurisdiction over all of the assets of the Stanford entities, including SIBL. *See* ROA.621–26; *see also* 28 U.S.C. § 754 (providing that a receiver "appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall . . . be vested with complete jurisdiction and control of all such property with the right to take possession thereof"). To the extent that Stanford property was located outside of the United States, the district court purported to bring those assets within its control by ordering the Stanford entities to transfer the property to American soil. *See United States v. Ross*, 302 F.2d 831, 834 (2d Cir. 1962) (permitting such an action by a receiver intended to reach foreign assets); *Citronelle-Mobile Gathering, Inc. v. Watkins*, 934 F.2d 1180, 1187 (11th Cir.

1991) (same).[4] Therefore, according to the Receiver, the district court has *in rem* jurisdiction over the entire *res* in the receivership estate—including *all* of SIBL's assets and litigation claims anywhere in the world. And the district court can leverage its *in rem* jurisdiction to issue injunctions that prohibit outside parties from interfering with that part of the *res*, regardless of whether it has *in personam* jurisdiction over those parties.

True, *in rem* jurisdiction enables a court to determine all the claims that anyone has to the property or thing in question, whether the persons are named parties or not. *See Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 448 (2004) (citation omitted); *see also Freeman v. Alderson*, 119 U.S. 185, 188–89 (1886); *Mankin v. Chandler*, 16 F. Cas. 625, 626 (C.C.E.D. Va. 1823) (No. 9,030) (Marshall, C.J.) (describing *in rem* suits as those "to which all the world are said to be parties"). Thus, a court with *in rem* jurisdiction over a piece of land can consider and decide all of the potential claims to that land, regardless of whether all of the potential claimants are within its jurisdiction.

But it is another thing entirely for a court to enjoin the whole world from bringing suits related to that piece of land. Injunctions bind people, not property, so *all* injunctions require *in personam* jurisdiction. *See Nken v. Holder*, 556 U.S. 418, 428 (2009) ("[A]n injunction is a judicial process or mandate operating *in personam* . . . . the order is directed at someone, and governs that party's conduct." (quotation omitted)); *see also Johnson v. Powers*, 139 U.S. 156, 159 (1891) ("A judgment *in rem* binds only the property within the control of the court which rendered it, and a judgment *in personam* binds only the parties to that judgment, and those in privity with them."). This limitation on the scope of injunctive relief is longstanding and

---

[4] Apparently our court has never blessed such actions by a receiver and a district court. We need not do so here because even assuming a receiver and district court can establish *in rem* jurisdiction this way, the district court still committed reversible error.

undisputed. *See, e.g.*, Note, *Equity Acting* in Rem*: Injunctions in the Absence of Personal Jurisdiction*, 50 Harv. L. Rev. 495, 497 (1937) ("[I]t is ordinarily impossible to enjoin a nonresident, not personally served in the state, unless he is either domiciled in the state, or has consented to its jurisdiction."); *Penn v. Lord Baltimore*, (1750) 27 Eng. Rep. 1132, 1134–35; 1 Ves. Sen. 444, 447–48 (LC) (noting that equity "acts *in personam*" over litigants). And there is nothing in federal statute or rule that enables the district court to disregard it. *Cf.* Fed. R. Civ. P. 66 ("[T]he practice in administering an estate by a receiver . . . must accord with the historical practice in federal courts . . . ."). Put simply: no *in personam* jurisdiction, no injunction.

The Receiver disagrees on two grounds. First, Janvey argues that receivership injunctions are somehow exempt from the rules that apply to every other federal injunction. *See* Receiver Red Br. at 19–24 (citing *Zacarias*, 945 F.3d at 896–905; *Lloyd's*, 927 F.3d at 841).

True, we have previously held that a district court's power over a receivership enables it to enjoin third parties or non-parties from pursuing certain claims involving the *res* of the receivership estate. *See, e.g.*, *Zacarias*, 945 F.3d at 897, 902; *Lloyd's*, 927 F.3d at 840. But our statements in those cases implicated the equitable remedies available to the district court and not its jurisdiction. No one objected to personal jurisdiction in those cases, likely because any such objection would have been frivolous.[5] But even if there were a latent *in personam* defect in those cases, our silence could never be construed as an implicit holding. *See Cooper Indus. v. Aviall Servs., Inc.*, 543

---

[5] In *Zacarias*, it appears that the appealing plaintiff-objectors had all litigated their suits against the settling defendants in Texas court, giving rise to specific personal jurisdiction related to the challenged bar order. *See* 945 F.3d at 893–94. And in both *Zacarias* and *Lloyd's*, the appellants objected to the settlement and bar order in front of the Texas federal district court, thereby consenting to personal jurisdiction. *See Zacarias*, 945 F.3d at 894; *Lloyd's*, 927 F.3d at 839.

U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)); *see also, e.g.*, *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 42 (2020) (Gorsuch, J., concurring in part and dissenting in part) ("This Court has long warned that matters lurking in the record, neither brought to the attention of the court nor ruled upon, should not be read as having decided anything." (quotation omitted)).

Second, Receiver Janvey argues that federal courts can enter *in rem* injunctions. *See* Receiver Red Br. at 24–25 (citing *United States v. Hall*, 472 F.2d 261 (5th Cir. 1972)). *Hall* suggested in dicta that federal courts may enter *in rem* injunctions in aid of a previous *in rem* judgment. *See, e.g.*, 472 F.2d at 266 ("A court entering a decree binding on a particular piece of property is necessarily faced with the danger that its judgment may be disrupted in the future by members of an undefinable class—those who may come into contact with the property. The *in rem* injunction protects the court's judgment."). It is unclear to us what the *Hall* court meant by this dicta.

But three things are clear. First, the *Hall* court's reference to an "*in rem* injunction" was unnecessary to its decision. Federal jurisdiction in that case was not *in rem*. So the court's *in rem* discussion was nonbinding dicta. *See, e.g.*, *Lafaye v. City of New Orleans*, 35 F.4th 940, 944 n.4 (5th Cir. 2022).

Second, at the time of the *Hall* decision, Supreme Court precedent was pellucid that injunctions can only attach through *in personam* jurisdiction. For example:

> It is elementary that one is not bound by a judgment in personam resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process. *Hansberry v. Lee*, 311 U.S. 32, 40–41

13

> (1940). The consistent constitutional rule has been that a court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant. *E.g.*, *Pennoyer v. Neff*, 95 U.S. 714 (1878); *Vanderbilt v. Vanderbilt*, 354 U.S. 416, 418 (1957).

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 110 (1969); *see also* Henry L. McClintock, Handbook on the Principles of Equity 84–85 (2d ed. 1948) (emphasizing that, when it comes to injunctions, "[e]quity acts in personam, and not in rem"). The *Hall* court had no power to deviate from that preexisting Supreme Court rule.

Third, post-*Hall* decisions confirm that injunctions always and everywhere require *in personam* jurisdiction. *See, e.g.*, *Nken*, 556 U.S. at 428; *Enter. Int'l, Inc. v. Corporacíon Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 470 (5th Cir. 1985) ("[T]he district court must have both subject matter jurisdiction and *in personam* jurisdiction over the party against whom the injunction runs." (internal quotation marks and citation omitted)). We therefore reiterate what the law is and has always been: federal injunctions in receiverships, as in all cases, can stand only if the court has *in personam* jurisdiction over the enjoined defendant.

B

Therefore, we turn to *in personam* jurisdiction. The Supreme Court has recognized two forms of personal jurisdiction: general and specific. *See Bristol-Myers Squibb Co. v. Superior Ct. of Calif.*, 582 U.S. 255, 262 (2017). Since the Joint Liquidators are based in Antigua, there is no general personal jurisdiction over them in Texas. *See Daimler AG v. Bauman*, 571 U.S. 117, 137–39 (2014).

Specific personal jurisdiction requires more discussion. Specific personal jurisdiction "covers defendants less intimately connected with a

State, but only as to a narrower class of claims." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021). To establish specific personal jurisdiction, three conditions must be met: (1) the defendant must have purposefully availed itself of the privilege of conducting activities in the forum State, (2) the plaintiff's claim must arise out of or relate to those purposeful contacts, and (3) the exercise of personal jurisdiction must be fair and reasonable. *See id.* at 359–60; *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–18 (5th Cir. 2021).

Personal jurisdiction, unlike subject matter jurisdiction, is waivable. The Supreme Court explained the distinction:

> Subject-matter jurisdiction . . . is an Art. III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign. Certain legal consequences directly follow from this. For example, no action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant . . . and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings. . . .
>
> None of this is true with respect to personal jurisdiction. The requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause. The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty. . . .
>
> Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived.

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702–03 (1982) (citations omitted).

15

A party can waive *in personam* jurisdiction in a variety of ways. It can expressly consent to personal jurisdiction in, for example, a contract. *See Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964). Or it can impliedly consent to personal jurisdiction by, for example, making a general appearance, *see McDonald v. Mabee*, 243 U.S. 90, 91 (1917), or answering a complaint without objection, *see* Fed. R. Civ. P. 12(h). Other examples abound, but the touchstone of every waiver is *consent*. That is, the question is whether the defendant took some action that he knew or should have known would subject him to the jurisdiction of the court—thus expressly or impliedly consenting to that jurisdiction. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("[T]he foreseeability that is critical to due process analysis is . . . that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.").

Thus, if foreign defendants are dragged before the forum court over their protestations, they have not consented to personal jurisdiction. *See, e.g.*, *PaineWebber Inc. v. Chase Manhattan Priv. Bank (Switzerland)*, 260 F.3d 453, 461 (5th Cir. 2001) (holding plaintiff "is dead wrong in suggesting that Chase–Switzerland, by making a motion based on the defense of personal jurisdiction, has thereby submitted to the court's jurisdiction"). It does not matter if the objecting defendants offer arguments sounding in both jurisdiction and the merits, so long as the point of their contention is that the forum court should not exercise power over them. *See ibid.* ("[W]e cannot fathom how a motion *premised* on a jurisdictional objection could simultaneously operate as a *waiver* of that very objection."); *accord Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 252 (5th Cir. 2020) (holding no waiver occurs when one "simultaneously protest[s] personal jurisdiction while vigorously advocating the merits of his case" (citation omitted)). Contrariwise, if the defendants appear before the court as "*de facto*

intervenors" or parties, seeking affirmative relief on the merits as proper parties would, then they have consented to the court's jurisdiction and cannot complain about it later. *See, e.g.*, *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 786 (5th Cir. 1990) ("Although they described themselves as 'specially appearing,' the [objecting parties] sought an affirmative act by the court that would benefit their [clients]. The fact that they sought *affirmative relief* controls, not the form of their appearance . . . ." (emphasis added)).

In a sense, this case is just like *PaineWebber*. Here, as there, the foreign parties were subjected to injunctions; and in both cases, the enjoined foreigners objected to the district courts' personal jurisdiction over them. In neither case did the enjoined foreigners seek relief beyond having the injunctions vacated for lack of jurisdiction and hence avoiding the district courts' exercises of judicial power over them. *Accord post* (Higginson, J., concurring in judgment), note 1, at 21.

On the other hand, as the Receiver points out, there are distinctions between this case and *PaineWebber*. For example, the Joint Liquidators did not file their personal-jurisdiction objection in a procedurally proper way and in the docket specified by the district court (No. 3:09-CV-298-N). They instead objected in the Chapter 15 docket where they had successfully objected to the Proskauer bar order (No. 3:09-CV-721-N). And it is also true, as the Receiver again points out, that the Joint Liquidators came to the district court before they were subjected to contempt proceedings. The Joint Liquidators could have honored what they characterize as the district court's "waiver trap," Blue Br. at 12–13, forgone any objection to the SGPB bar order, waited for a contempt motion from SGPB, and then tried their luck at that point.

But the answer to the Receiver's concerns is that "traditional notions of fair play and substantial justice" prohibit the district court's so-called

waiver trap. *Cf. World-Wide Volkswagen*, 444 U.S. at 292 (quotation omitted). That waiver trap effectively placed the Joint Liquidators on the horns of a waive-or-forfeit dilemma: waive your personal jurisdiction objections (by generally appearing in the district court's specified docket, No. 3:09-CV-298-N) or forfeit your merits objections. That vitiated the Joint Liquidators' voluntariness because either route they chose was tainted by coercion. That is not how personal jurisdiction is supposed to work.[6]

Accordingly, the waiver trap in the district court's scheduling order is VACATED. The SGPB bar order is likewise VACATED insofar as it purports to apply to the Joint Liquidators.[7] The case is REMANDED for further proceedings consistent with this opinion.

---

[6] In finding a lack of *in personam* jurisdiction, we maintain the deepest respect for our district court colleague, who, as JUDGE HIGGINSON cogently notes, "has steadfastly presided over the recovery of billions of dollars for investors defrauded by Robert Stanford." *Post*, at 19. We respect the district court's longstanding management of the Stanford case; indeed, this court has repeatedly affirmed its decisions. *See, e.g.*, *Zacarias*, 945 F.3d at 905; *Janvey*, 767 F.3d at 443. And we appreciate the complexities embedded in this transnational dispute between sophisticated litigants.

[7] With respect to the choice of remedy, we find much in common with our concurring colleague who would also vacate the scheduling order and the bar order, *see post*, at 20, although we only vacate parts of each order.

Stephen A. Higginson, *Circuit Judge*, concurring in judgment:

I write separately because I am unpersuaded this district judge who, for fifteen years, has steadfastly presided over the recovery of billions of dollars for investors defrauded by Robert Stanford, set a "waiver trap" for litigants in the final stages of the receivership estate. *Ante*, at 18. Instead, I see only a finishing dispute over limited, remaining overseas assets best resolved on remand through clarification of the parties' Settlement Agreement and Cross-Border Protocol approved by the district court.

I further disagree (1) that the Cross-Border Protocol confirms that the "the Receiver was not" recognized to pursue Stanford-related claims in Switzerland, *ante*, at 6; (2) that the present dispute is "a redux of the parties' dispute over the Proskauer settlement," which was resolved by this district judge's *denial* of a contempt order against the Joint Liquidators, *ante*, at 7; (3) that "relevan[cy]" permits our court to cure notice of appeal, record, and possibly jurisdictional deficiencies by supplementing the current record, over objection, with the Chapter 15 proceedings still pending without a district court final order, *ante*, at 9; *see MidCap Media Finance v. Pathway Data*, 929 F.3d 310, 315-16 (5th Cir. 2019) ("Since at least 1878, the Supreme Court has prohibited us from receiving jurisdictional evidence on appeal."); and, finally, most importantly, (4) that we should decide consequential equity-receivership jurisdiction in the first instance, both criticizing a considerable body of Fifth Circuit precedent for in rem injunctions, even precedent as to this very district court and receivership, *see SEC v. Stanford Int'l Bank, Ltd.* ("*Lloyd's*"), 927 F.3d 830, 851 (5th Cir. 2019) ("The district court has exclusive *in rem* jurisdiction over the policy proceeds and permanent bar orders have been approved as parts of settlements to secure receivership assets."); *see also United States v. Hall*, 472 F.2d 261, 265-68 (5th Cir. 1972) (observing that "[f]ederal courts have issued injunctions binding on all persons, regardless of notice, who come into contact with property which is

19

the subject of a judicial decree"), and also conclusively deciding jurisdictional facts not yet ascertained by the district court which, instead, we now decide against that court as "tainted by coercion" and the result of "a waiver trap," *ante*, at 18.

Those concerns, though significant, should not obscure my larger agreement that the Joint Liquidators must have a "procedurally proper" opportunity to object to an anti-suit injunction applicable to them. *Ante*, at 17. That opportunity would permit the district court and the parties to resolve the Chapter 15 proceedings still pending, and/or join these two separate matters. Additionally, it would provide us with resolved jurisdictional facts decided by a factfinder, not by us: above all, the due process consequence of the Joint Liquidators' extremely active participation in the receivership scope and structure, yet their simultaneous effort to parse that participation, bifurcating proceedings, to oppose personal jurisdiction. Relatedly, it would allow the parties and the district court to work through, for the first time, the factual scope of this equity receivership, consistent with—or updating—their sweeping Cross-Border Protocol. It would also permit the parties and the district court to make an initial attempt to apply longstanding Fifth Circuit in rem and in personam precedent pertaining to injunctions against nonparties.

For these reasons, I would do no more than reverse and remand, accepting the Joint Liquidators' alternative request for relief—to which they stipulated in their briefing and reaffirmed at oral argument, *see* Oral Arg. at 3:58-4:18—that we "should vacate the district court's scheduling order and the antisuit injunction and instruct the district court to consider all the JLs' objections, including their personal-jurisdiction defense." *See Airline Maintenance Lodge 702 v. Loudermilk*, 426 F.2d 802, 802 (5th Cir. 1970) (per curiam) (remanding for the district court to "make appropriate findings and conclusions regarding [its] jurisdiction" in the first instance); *Torgeson v.*

20

*Nordisk Aviation Prods., Inc.*, 997 F.2d 881 (5th Cir. 1993) (same); *Molett v. Penrod Drilling Co.*, 872 F.2d 1221, 1227-29 (5th Cir. 1989) (per curiam) (same); *Strain v. Harrelson Rubber Co.*, 742 F.2d 888, 889-90 & n.2 (5th Cir. 1984) (per curiam) (same); *cf. PaineWebber Inc. v. Chase Manhattan Priv. Bank (Switzerland)*, 260 F.3d 453, 460-61 (5th Cir. 2001); *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 249-52 (5th Cir. 2020).[1]

---

[1] Consistent with the Joint Liquidators' alternative request to remand, I do not read *Trans World Airlines* to the contrary. *Trans World Airlines, Inc., v. Mattox*, 897 F.2d 773 (5th Cir. 1990). Just as we confirmed in *Trans World* that a party does *not* consent to suit in a particular forum by hiring counsel to appear and object to personal jurisdiction, the Joint Liquidators have never voluntarily appeared *consenting* to, or even acquiescing in, personal jurisdiction as to the settlement and bar order enjoining them from litigation in Switzerland. Instead, at every turn, their appearance has been to challenge the district court's personal jurisdiction to order the Swiss anti-suit injunction. *Cf. id.* at 786 (noting adoption of the Second Circuit's statement in *Grammenos v. Lemos*, 457 F.2d 1067, 1070 (2d Cir. 1972), that "[i]f a party enters a case, *makes no objection to jurisdiction*, and asks the court to act on its behalf in some substantive way, it will be held to have waived further objection" (emphasis added)); *see also Wyrough & Loser, Inc. v. Pelmor Lab'ys, Inc.*, 376 F.2d 543, 545-47 (3d Cir. 1967).